# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

CIVIL ACTION NO. 1:17cv611-WOB

SHERRY LAAKE                                                        PLAINTIFF

VS.                          <u>MEMORANDUM OPINION AND ORDER</u>

THE BENEFITS COMMITTEE, WESTERN                    DEFENDANT
AND SOUTHERN FINANCIAL GROUP COMPANY
FLEXIBLE BENEFITS PLAN, ET AL.

In the present matter, Plaintiff Sherry Laake argues that her long-term disability benefits were improperly denied by the Defendants. Both parties have filed motions for judgment on the administrative record. (Doc. 19, Doc. 20). The Court heard oral arguments on Tuesday, January 15, 2019. Claire Danzl represented the Plaintiff, and Eric Richardson and Wes Abrams represented the Defendants. Court reporter Lisa Wiesman recorded the proceedings.

*Factual and Procedural Background*

1. **The Plan provisions**

Plaintiff Sherry Laake was an employee at Western & Southern Financial Group ("W&S") and participated in the Western & Southern Financial Group Flexible Benefits Plan ("Plan"). (Doc. 1 ¶ 1). The Plan is an employee welfare benefit plan as defined by the Employee Retirement Income Security Act (ERISA). (Id. ¶ 2). The Plan provides for long term disability (LTD) benefits, which it defines as follows:

> Long Term Disability or Long Term Disabled shall mean for the first 24 months after the expiration of Temporary Disability, the complete and continuous incapacity of such Covered Employee to perform all of the material duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience. After the expiration of 24 months of Long Term Disability, Long Term Disability or Long Term Disabled shall mean the complete and continuous incapacity of the Covered Employee, to

engage in any and every occupation, business or employment, including self employment, for wages, compensation or profit.

(AR 803-04).

The Plan vests discretion in its administrators to determine whether claimants are eligible for benefits. (AR 896). Administrators of the Plan are not compensated for their services, but can be reimbursed for reasonable expenses. (AR 899).In order to maintain eligibility for LTD benefits, claimants are also required to apply for Social Security Disability benefits within 30 days of filing under the Plan. (AR 833).

The Plan has certain exceptions for LTD benefits. The only important exception in this case is found in § 7.6(j):

> § 7.6: No benefits shall be paid for any period of Long Term Disability: (j) where the Long Term Disability extends beyond 24 months and is caused by a condition or disorder excluded from the definition of Mental Illness in Section 2.37. (See Schedule C)[.]

(AR 835-36).

Schedule C of the Plan lists mental illnesses that are "excepted under § 2.36 and subject to the limitations set forth in § 7.6(k)," including Chronic Pain Syndrome. (AR 947-48).

2. **Plaintiff's History Under the Plan**

Laake stopped working at W&S in April of 2016. (Doc. 20 at 5). She filed for LTD benefits in August of 2016. (AR 6). She claimed that she was disabled due to rheumatoid arthritis, which caused her severe pain, problems walking or sitting for long periods of time, and stiffness and swelling in her joints, among other issues. (AR 6). W&S sent questionnaires to several of Laake's treating physicians and asked if she met the definition of long-term disabled included above. (AR 10). W&S did not ask about Chronic Pain Syndrome in any of these questionnaires.

Laake's physicians responded and included synopses of Laake's medical history, which is undeniably complex. Her rheumatologist, Dr. Muntel, said Laake had a variety of fluctuating

symptoms. (AR 33). Laake had been diagnosed with undifferentiated inflammatory arthritis (consistent with seronegative rheumatoid arthritis), osteoporosis, chronic pain, chronic fatigue, chronic myofascial pain syndrome, and other various ailments. (AR 33, 38). Laake's rheumatologist (AR 33-34), neurologist (AR 36), and immunologist/allergist (AR 37-38) said that Laake met the definition of long term disabled and could not currently work. Laake's neurologist, however, said that Laake would have the capacity to work in a sedentary position in about three to four months from the time of her response to the questionnaire. (AR 36).

Laake regularly visited Dr. Muntel for her rheumatoid arthritis and her visits dating back to January of 2016 are included in the record. Laake's ability to do certain tasks, like make fists, has remained the same but her ability to ambulate easily without assistance has declined. (*Compare* AR 132, 1/16 visit, *with* AR 202, 6/16 visit). Dr. Muntel has regularly diagnosed Laake with inflammatory arthritis and various kinds of pain—chronic foot pain, chronic low back pain, or chronic pain in general. (AR 136, 140. 148, 153, 183, 209). However, Dr. Muntel has also consistently stated that Laake's exams are often unimpressive and her pain "frequently seems out of proportion to exam." (AR 133, 145, 204, 215). Despite this, Dr. Muntel told Laake to take time off from April through July in 2016 because Laake could not do her job until her symptoms were under better control. (AR 154, 189, 205, 216). Dr. Muntel often opined during this time that Laake would not be able to return to her current job. (*See, e.g.*, AR 216).

Laake also saw Dr. Stillwagon, a neurologist, who diagnosed her with pelvic somatic dysfunction and myofascial muscle pain (AR 163), chronic pain (AR 169), and right low back pain (AR 175) over the course of several visits. Dr. Stillwagon also noted that Laake had chronic degenerative disc disease at L4-5 but no other significant degenerative change. (AR 166). Laake also underwent an EMG, which came back normal. (AR 175). Laake saw an

allergist/immunologist, Dr. Bernstein, whose most recent diagnosis for Laake was mixed rhinitis, myofascial pain, and chronic arthritis. (AR 112). Laake saw Dr. Eisele, an orthopedist, who noted that Laake had significant swelling in her left ankle with a trace of effusion, but her conditions had improved about six weeks later with only mild swelling in the left ankle. (AR 102-03). Dr. Eisele also diagnosed her with rheumatoid arthritis and synovitis and unspecified tenosynovitis, along with other diagnoses. (AR 107).

Upon Laake's initial request, the Benefits Department reviewed the materials submitted by Laake's physicians and decided that Laake's LTD benefits were approved for only 24 months. (AR 41). The Benefits Department told Laake this was because her disability was due to chronic pain, which was limited by the Plan to only 24 months under its provision for mental, nervous, psychiatric condition or chronic pain. (AR 29). The Benefits Committee letter did not cite the specific Plan provision that contains this exception. Laake's LTD benefits were granted in October of 2016, which meant they would naturally terminate in October of 2018.

Laake appealed and argued that her disabling condition was rheumatoid/inflammatory arthritis, not chronic pain. (AR 25). Laake also informed W&S that she had been approved for Social Security disability benefits. (AR 25). As part of the appeal process, W&S referred Laake's case to Medical Care Management Corporation (MCMC) in order to have an independent review of Laake's claim. (AR 21). W&S requested that a rheumatologist perform the review, and Dr. Sara Kramer was the chosen doctor. (AR 20-21).

In its referral, W&S included its definition of LTD and the exclusion provision for Chronic Pain Syndrome. (AR 14). It asked Dr. Kramer to consider if Laake was disabled for any reason other than pain and if there were other diagnoses to consider. (AR 14). Dr. Kramer reviewed the other physicians' reports and spoke with Dr. Muntel. (AR 14-16). She found that Laake was

disabled for a reason other than pain—atypical inflammatory arthritis—and that this needed to be considered for LTD benefits. (AR 16). Dr. Kramer disagreed with Laake's physicians' conclusions, though, and found that the medical information did not support Laake being unable to engage in any occupation. (AR 16). Dr. Kramer found that Laake could sit without restriction and could work under certain limitations. (AR 16).

The Benefits Appeal Committee considered the information Laake submitted with her original application and found that the documentation did not support her inability to work. (AR 3). They also found that she was disabled due to pain and was not awarded LTD benefits beyond 24 months. (AR 3). In May of 2017, Laake was informed of both of these reasons in a denial letter, along with her right to bring suit. (AR 1). This suit promptly followed.

*Analysis*

1. **The standard for LTD benefits decisions.**

When a Plan administrator has discretion to decide claims for benefits, the Court must use an arbitrary and capricious standard of review. *Farhner v. United Transp. Union Discipline Income Protection Program*, 645 F.3d 338, 342 (6th Cir. 2011). "We will uphold a benefits determination if it is 'rational in light of the plan's provisions.'" *Judge v. Metro Life Ins. Co.*, 710 F.3d 651, 658 (6th Cir. 2013) (quoting *Jones v. Metro Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). Because the Plan in this case vests its administrators with discretion to decide whether a claimant is eligible for benefits, the arbitrary and capricious standard applies. (AR 896).

While this standard is very deferential, courts are instructed to take certain factors into account when reviewing benefits decisions. One factor that often comes up is a conflict of interest. The Supreme Court has recognized that an entity that both determines eligibility and pays the benefits out of its own pocket is acting under a conflict of interest. *Metro Life Ins. Co. v. Glenn*,

554 U.S. 105, 108 (2008). Further, when a Plan administrator bases its denial on its belief that an exclusion applies, the "ERISA plan, not the participant, has the burden of proving an exclusion applies . . . ." *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 443 (6th Cir. 2005).

    **2. W&S incorrectly determined that Laake fit under the Chronic Pain Syndrome exception.**

W&S denied Laake extended benefits because it determined that her disability was based on chronic pain. (AR 29). In its letter to Laake, W&S did not cite any specific provision of the Plan as the basis for its decision, but, based on later correspondence with Laake and its motions filed with this Court, it seems that W&S relied on § 7.6(j) for this denial. As explained above, § 7.6(j) denies extended coverage for a disability that is based on certain mental illnesses, which includes Chronic Pain Syndrome. Because this is an exclusion under the Plan provisions, W&S bears the burden of proving it is satisfied. *McCartha*, 419 F.3d at 443.

Schedule C of the Plan incorporates the DSM-IV.[1] (AR 947). While the DSM-IV does not include Chronic Pain Syndrome, it does include Pain Disorder. (AR 720-23). The DSM-IV identifies two variants of this disorder; both require psychological factors to play a part in the onset and maintenance of the pain. (AR 720). It also states that pain that is associated with a general medical condition and in which psychological factors play either no role or only a minimal role is not a mental disorder. (AR 720).

Chronic Pain Syndrome is recognized in the International Classification of Diseases ("ICD"). Importantly, the ICD recognizes Chronic Pain Syndrome as a separate diagnosis from chronic pain itself. "Other chronic pain" is diagnosed as ICD-9-CM 338.29 (or ICD-10-CM

---

[1] The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, (DSM-IV) is published by the American Psychiatric Association.

G89.29, in the updated version) and "Chronic Pain Syndrome" is ICD-9-CM 338.4 (or ICD-10-CM G89.4).[2]

There is ample evidence in the record that Laake suffers from chronic pain, but there is no evidence whatsoever that she suffers from Chronic Pain Syndrome. Dr. Muntel routinely diagnosed Laake with other chronic pain using the appropriate ICD numbers listed above. (AR 136, 140, 183). Dr. Stillwagon also diagnosed Laake with other chronic pain. (AR 169). At no point did any of Laake's physicians use the diagnostic code for Chronic Pain Syndrome. The DSM-IV requires that psychological factors play a significant part before a person can be diagnosed with Pain Disorder, and no doctor ever addressed any sort of psychological bases for Laake's pain.

Further, when W&S began its LTD decision process, it did not ask any of Laake's physicians whether she had Chronic Pain Syndrome—it only asked if the she met the general LTD definitions. (AR 49). When Laake appealed W&S's decision, W&S specifically asked for a rheumatologist to review Laake's file and did not ask for someone trained to identify Chronic Pain Syndrome. (AR 21). W&S asked Dr. Kramer if Laake was disabled for a reason other than pain, and Dr. Kramer concluded that Laake was—she told W&S that Laake's "[a]typical inflammatory arthritis as supported by the multiple rheumatologists she has seen" needs to be considered for long-term disability. (AR 16). Even their reviewing consultant, then, told W&S to look elsewhere for their LTD determination.

Because there is no support in the record that establishes Laake suffered from Chronic Pain Syndrome as opposed to her oft-diagnosed chronic pain, W&S's characterization of her evidence is unreasonable. *See Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 850 (6th Cir. 2000) ("We cannot accept this as a reasonable characterization of Mr. Weaver's medical history.").

---

[2] www.icd9data.com; www.icd10data.com

W&S failed to prove that Laake fit the § 7.6(j) exclusion, and its decision to deny her benefits based on this provision was arbitrary and capricious.[3]

> **3. W&S did not properly analyze whether Laake fits the second definition of "long term disabled."**

In the alternative, W&S argues that Laake is not entitled to benefits beyond 24 months regardless of the Chronic Pain Syndrome limitation because it decided that she did not meet the extended LTD definition. (Doc. 19 at 16 n.11).

When making this determination, though, W&S erred in its application of the LTD standard. As explained above, the arbitrary and capricious standard of review will allow a decision to be upheld if it is "rational in light of the plan's provisions." *Univ. Hosps.*, 202 F.3d at 846 (internal quotations omitted). Thus, courts must consider the terms of the Plan itself when reviewing an LTD determination under the arbitrary and capricious standard. "[T]he terms of the Plan must be construed according to their plain meaning, in an ordinary and popular sense." *Id.* at 849 (internal quotations omitted).

Here, the Plan creates a two-step analysis for LTD benefit decisions. There is an initial period of LTD benefits that lasts for 24 months when the claimant is completely and continuously incapable of performing "all of the material duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience." (AR 803). Then, *after 24 months has expired*, "Long Term Disability or Long Term Disabled shall mean the complete and continuous incapacity of the Covered Employee, to engage in any and every

---

[3]As mentioned above, courts are instructed to consider possible conflicts of interests when the Plan is administered by one entity that both determines eligibility and pays benefits from its own funds. *See Metro Life Ins. Co.*, 554 U.S. at 108. Laake alleged that the Plan here is self-funded and W&S has not disagreed—it only argued that Laake has not offered sufficient evidence that any conflict swayed its decision. *Compare* Doc. 20 at 11, *with* Doc. 21 at 18-19. While W&S's decision was arbitrary and capricious based on the complete lack of evidence regarding Chronic Pain Syndrome, the Court also notes W&S's potential conflict of interest since W&S clearly benefited by finding that Laake's benefits were limited to 24 months through its incorrect application of the Chronic Pain Syndrome exclusion. This further weighs in favor of finding that the decision was arbitrary and capricious.

occupation, business or employment, including self employment, for wages, compensation or profit." (AR 803-04). Thus, based on the plain language of the Plan, there are two kinds of LTD benefit decisions: one that must be satisfied for the claimant to receive 24 months of benefits, and then a separate decision that determines if the claimant receives benefits beyond 24 months. W&S itself has recognized that LTD determinations have these two components. (Doc. 21 at 17) ("Here, however, the Plan provides two distinct categories of LTD benefits[.]") (*See also* Doc. 19 at 2, 15).

Based on the plain language of the Plan, then, W&S's decision for Laake should have been two-fold: an initial LTD decision that would award her benefits for 24 months when Laake applied in October of 2016, and then a decision after the expiration of 24 months in 2018. The standard that Laake is incapable of engaging in "any and every occupation" should have only applied after 24 months had passed. Instead, W&S asked her doctors, and based its decision on appeal, on Laake's ability to satisfy this definition in October of 2016. There is nothing in the Plan that says a claimant must prove she fits this second definition when she initially files for LTD benefits. There may be little practical difference between these two definitions, but the fact remains that, according to the Plan's provisions, there should be an initial decision based on the first standard and a second decision made after 24 months.

W&S seemingly decided that, because it believed Laake's disability came from chronic pain and was therefore limited to 24 months, it was appropriate to preemptively decide if Laake met the definition for extended LTD benefits. It did this even though several of the consulting physicians—including Dr. Kramer in her review of W&S's decision and Laake's primary rheumatologist, Dr. Muntel—stated that Laake's abilities could change over time. (AR 16, 33-34, 36, 38). W&S's analysis in this case essentially collapsed a two-step inquiry into one: W&S can decide if the initial 24-month definition is satisfied, and, if it is, then decide if the extended

9

coverage definition is satisfied at the same time. The clause requiring that a new standard applies

"[a]fter the expiration of 24 months" would functionally be rendered void. By asking Laake to

satisfy a definition two years earlier than the Plan required her to, W&S exceeded its power to

interpret the plan and essentially rewrote it. *See Univ. Hosps.*, 202 F.3d at 849. This application

goes against the Plan's provisions and was arbitrary and capricious.[4]

Even though W&S's decision was arbitrary and capricious, it is not clear from the record

that Laake was denied benefits that she clearly deserved. "Where the problem is with the integrity

of the plan's decision-making process, rather than that a claimant was denied benefits to which he

was clearly entitled, remand to the plan administrator is the appropriate remedy." *Helfman v. GE

Group Life Assurance Co.*, 573 F.3d 383, 396 (6th Cir. 2009) (internal quotations and alterations

omitted). Whether Laake was disabled at the termination of the initial 24-month period is currently

unknown since W&S did not properly apply the LTD definition. The matter will therefore be

remanded to W&S for further proceedings consistent with this decision.

4. **W&S did not inform Laake that it was considering whether she satisfied the second LTD definition in its initial decision, therefore depriving her of proper notice of this basis for its decision on appeal.**

Remand is also warranted due to W&S's insufficient notice procedures in this case. ERISA

mandates that a Plan give the participants adequate notice of the reasons for denying benefits and

a reasonable opportunity for a full and fair review.[5] 29 U.S.C. § 1133. This Circuit has adopted a

substantial compliance test for § 1133 that requires courts to consider all communications between

---

[4] This inaccurate reading of the Plan's LTD-determination process is more problematic when we again consider W&S's alleged conflict of interest: by forgoing the correct 24-month application, W&S benefited by deciding that Laake was not entitled to extended LTD benefits. *See Metro Life. Ins. Co.*, 554 U.S. at 108; *Univ. Hosps.*, 202 F.3d at 850.

[5] Specifically, § 1133 requires that the Plan "(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133.

administrators and participants to see if the administrators fulfilled the essential purpose of § 1133 by notifying the claimant of the specific reasons for a denial and providing an opportunity to have that decision "fully and fairly reviewed by the fiduciary." *McCartha*, 419 F.3d at 444; *Houston v. Unum Life Ins. Co. of Am.*, 246 F. App'x 293, 300 (6th Cir. 2007). If the administrator did not substantially comply with § 1133, "reversal and remand . . . to the plan administrator is ordinarily appropriate." *Houston*, 246 F. App'x at 300. Courts use a de novo standard for § 1133. *Id.*

The Sixth Circuit has found that an administrator failed to substantially comply with § 1133 when it originally provided only one reason for denial but then introduced a new, additional reason on appeal. *McCartha*, 419 F.3d at 446 ("Defendants were not in substantial compliance with the requirements of § 1133 because McCartha was not timely informed that the failure to provide current medical opinions as to her long-term disability would be one of the bases for termination of her benefits.").

That is precisely what W&S did in this matter. In its original denial letter to Laake, W&S did not mention the two-pronged LTD definition included above and stated only that the "Plan contains a provision that limits the LTD benefit to 24 months if the disabling condition is due to any mental, nervous, psychiatric condition or chronic pain. Since your disabling condition is chronic pain, your benefit payments will be limited to 24 months." (AR 29). It is not clear from this letter that the Benefits Committee considered any information related to Laake's ability to engage in any and all occupations in accordance with the extended LTD-definition since it applied the chronic pain limitation as a bright-line rule: because it decided Laake's disability came from chronic pain, her benefits were limited to 24 months pursuant to the Plan's explicit provision. However, W&S stated in its decision on appeal that Laake was not incapable of working and,

11

again, concluded her disability came from chronic pain before denying her request for additional benefits. (AR 1).

Despite W&S's assertions, there is no indication that Laake was aware W&S was considering her inability to work prior to the appeal letter. Laake acknowledged that she needed to provide her medical information and was generally aware of the LTD definition. (AR 6-7, 124-26). As Laake wrote in her letter requesting an appeal, though, "[t]he Company based the decision to limit my benefits because it determined the disabling condition to be chronic pain." (AR 22). W&S provided Laake with documents used by the Benefits Committee in its decision, but these documents did not inform her that the decision was partly based on her inability to work. (*See* AR 22). The relevant documentation revealed that each of Laake's treating physicians concluded she was disabled but W&S's written decision was only that she was approved for 24 months because of chronic pain. (AR 41).

Remand is further warranted, then, due to W&S's failure to substantially comply with § 1133. Because W&S did not properly notify Laake that it was considering her ability to engage in any occupation—two years earlier than provided under the Plan—W&S was not in substantial compliance with § 1133.

**5. Laake's request for attorney's fees is denied.**

As W&S mentions, Laake has "perfunctorily contend[ed]" that she is entitled to attorney's fees. (Doc. 21 at 20; Doc. 1 at 6). This characterization is correct since Laake has not developed her argument beyond simply making this request in her Complaint. There is no presumption that attorney fees will be awarded in ERISA cases. *Moon v. UNUM Provident Corp.*, 461 F.3d 639, 643 (6th Cir. 2006). This analysis normally involves a five-factor test in which no factor is

determinative and the Court uses its discretion in making a final decision. *Id.* at 642-44. Since Laake has not developed this argument, Laake's request for attorney's fees is denied.

*Conclusion*

Therefore, having reviewed this matter, and the Court being otherwise advised, **IT IS ORDERED** that:

(1) Laake's Motion for Judgment on the Administrative Record (Doc. 20) be, and is hereby, **granted**;

(2) W&S's Motion for Judgment on the Administrative Record (Doc. 19) be, and is hereby, **denied**; and

(3) Laake's claim is **remanded** to W&S for further proceedings consistent with this decision.

This 19th day of February, 2019.



Signed By:
William O. Bertelsman
United States District Judge